# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KAREN LYNN SPEARMAN,

Defendant-Appellant.

UNPUBLISHED
December 20, 2018

No. 340235
Macomb Circuit Court
LC No. 2016-003473-FH

Before: CAVANAGH, P.J., and SERVITTO and CAMERON, JJ.

PER CURIAM.

A jury convicted defendant, Karen Spearman, of two counts of adulterating, misbranding, removing, or substituting a drug or device, MCL 333.17764(2)(a), and one count each of driving while license suspended, MCL 257.904, and felonious assault, MCL 750.82. The trial court sentenced Spearman to two years' probation, with three days to be served in jail. We affirm Spearman's convictions but remand for a determination of the factual basis for the assessment of $600 in court costs.

Spearman was employed as an agency nurse at a medical facility in Mount Clemens. On January 13, 2016, another nurse discovered morphine bottles with puncture holes, as well as significantly reduced concentration levels of the medicine inside, in Spearman's medicine cart. Because of the suspected tampering with the morphine bottles, Spearman was required to be drug tested in accordance with facility policy. While Spearman was at first compliant with hospital administration, she ultimately refused to cooperate and instead fled the facility in her car before a drug test could be administered. When a worker attempted to stop Spearman's car from exiting the parking lot, Spearman struck the worker. Spearman's driver's license was suspended at the time.

## I. SUFFICIENCY OF THE EVIDENCE

Spearman first argues that there was insufficient evidence to support her two convictions of adulterating, misbranding, removing, or substituting a drug or device knowing or intending that the drug or device shall be used. We disagree.

A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010). This Court reviews the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have

found that the essential elements of the crime were proved beyond a reasonable doubt. *Id*. at 175. "All conflicts with regard to the evidence must be resolved in favor of the prosecution." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

MCL 333.17764 provides, in relevant part:

(2) A person shall not knowingly or recklessly do either of the following:

(a) Adulterate, misbrand, remove, or substitute a drug or device knowing or intending that the drug or device shall be used.

* * *

(3) Except as otherwise provided in this section, a person who violates subsection (2) is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $1,000.00, or both.

As Spearman notes, Black's Law Dictionary defines an "adulterated drug" as, "[a] drug that does not have the strength, quality, or purity represented or expected." *Black's Law Dictionary* (10th ed).

Spearman was a nurse sent by a staffing agency to fill a temporary opening at the medical facility. Per the policy of the medical facility, prior to passing a medicine cart, the incoming nurse and outgoing nurse would perform an inventory check of the cart together. The testimony at trial established that morphine bottles locked in a medicine cart were intact when Spearman took possession of the cart at the beginning of her shift. However, the bottles were punctured when Spearman passed her medicine cart to nurse Jackie Solowski at the end of Spearman's shift. The nurse who gave the cart to Spearman, Jessica Johnson, testified that, during an inventory at the beginning of Spearman's shift, Johnson checked the condition of each morphine bottle by turning it upside down and squeezing. According to Johnson, there were no holes in the bottles at that time. Spearman accepted the keys to the medicine cart, and according to her expert's testimony, she thus accepted the count and condition of the narcotics on the cart. Throughout her shift, Spearman was the only person with access to those narcotics. When Solowski tested the morphine bottles at the end of Spearman's shift, three bottles were punctured near the bottlenecks and a small amount of liquid sprayed out when Solowski squeezed them. Although Spearman claimed at trial that she did not know how the bottles were damaged, she was the only person with access to the bottles in the locked medicine cart, and the jury could infer that Spearman caused the damage. The fact that Spearman subsequently refused to participate in a drug test and fled from the medical facility in her vehicle—hitting an employee trying to escort her to the drug testing—also demonstrated her consciousness of guilt. *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) (evidence of flight is probative because it may indicate consciousness of guilt, although evidence of flight by itself is insufficient to sustain a conviction). Additionally, forensic testing of the contents of two of the punctured bottles demonstrated that the absorbent levels of the morphine were .4 and .3, but should have been .7, and a chemist testified that the changes were significant and would not result naturally. From this evidence, a reasonable jury could conclude that Spearman adulterated two bottles of the morphine.

Spearman does not challenge the sufficiency of the evidence that she knew or intended the adulterated morphine shall be used. Regardless, we note that the morphine was prescribed to hospice patients on Spearman's floor at the medical facility to manage their "intractable pain" and to "keep them comfortable." Solowski testified that their patients needed the morphine. In light of these facts, there was sufficient evidence to convict Spearman of two counts of adulterating, misbranding, removing, or substituting a drug or device knowing or intending that the drug or device shall be used.

On appeal, Spearman attempts to undercut the evidence supporting her convictions by noting that Solowski stored the damaged bottles of morphine in the refrigerator for a short time until management could investigate the problem. As Spearman notes, the manufacturer's instructions recommend storing morphine at temperatures between 68 and 77 degrees. Regardless, the chemist testified that the chemical composition of the morphine should not change in any way from refrigeration for the time alleged. After the morphine was collected by the evidence technician and stored for testing by the crime lab, it remained in the property room, where it was not refrigerated or exposed to high temperatures.

Spearman also notes that the condition of the boxes containing the morphine was dilapidated at the time of trial, but they had been in good condition when they were collected from the medical facility for evidence. The chemist observed the condition of the boxes at trial and opined that they were not in the same condition as they had been when he received them for testing. He opined that any changes to the boxes after testing and before trial would not have had any effect on the test results of the contents of the bottles.

Spearman further claims that the practice at the medical facility—of turning the morphine bottles upside down and squeezing them—was unknown to her expert and Spearman. However, this argument actually supports Spearman's convictions. The jury could infer that, if Spearman did not know about the practice, she may have tampered with the neck of the bottles under the belief that the puncture holes would go undetected.

Spearman suggests there was a problem with the chain of custody by noting apparent conflicts in the testimony regarding the amount of morphine in the bottles. The record demonstrated that a bottle of morphine is considered "full" if it contains more than 30 milliliters. Solowski testified that the bottles were initially full and the manager who investigated the incident, Demetria Gross, testified that all three bottles at issue appeared to have slightly more than 30 milliliters. Solowski opined that, after the bottles were squeezed and liquid sprayed out, the bottles were obviously no longer full. When the chemist subsequently received the bottles at the crime lab, however, he opined that they still appeared to be full. Given that Solowski and Gross both testified that only a "thin stream" and a "tiny little spray" of liquid was squeezed from each bottle, and there was no evidence how much liquid was actually released, the jury could infer that the bottles still contained more than 30 milliliters of liquid and were, by definition, "full," when the chemist received them. Drawing reasonable inferences from the evidence was within the exclusive province of the jury and should not be second-guessed by this Court. *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008); *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998). Moreover, the chemist testified that, regardless of the amount of morphine in the bottle, the composition would not change under normal circumstances. But, here, two bottles had significantly lower absorbent levels.

Spearman also challenges the sufficiency of the evidence establishing that she was the perpetrator. Identity is an element of every crime. See *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008) ("[I]t is well settled that identity is an element of every offense."). As she repeatedly argued at trial, Spearman claims on appeal that Solowski "accepted" the keys to the medicine cart, so she was solely responsible for the locked narcotics inside, including the punctured morphine bottles. The standard of care for medicine cart reconciliation at shift changes requires the nurse coming off duty and the nurse coming on duty to take an inventory of the controlled substances on the cart. If the incoming nurse finds no discrepancies, the nurse accepts the keys to the medicine cart and both nurses sign a reconciliation sheet. The expert testified that, if there is a discrepancy, management is notified and the outgoing nurse should not relinquish the keys. According to the expert, if the incoming nurse accepts the keys, that nurse accepts the inventory "as is" in the cart. Solowski testified that it is the policy at the medical facility for the nurses to stay by the cart until management responds to the problem. But she recalled that, despite the policy, Spearman nevertheless chose to leave the cart, explaining that she needed to administer medications in the other section where she was working. Solowski testified that she could not force Spearman to stay. As an alternative, Solowski proposed that, in the meantime, they lock the damaged bottles in a medicine room refrigerator. Spearman accompanied Solowski to the medicine room for that purpose. Viewing the evidence in a light most favorable to the prosecutor, Spearman thwarted the effectuation of the policy by leaving the cart and not waiting for management.

Spearman relies on her own conflicting testimony to argue that Solowski never told her there was a problem with the bottles during their inventory. Spearman testified that she left Solowski to administer medications in the other section and, at that time, she believed that Solowski's inventory was "good." Spearman claims that Solowski only squeezed the bottles and discovered the holes when she was alone. Therefore, Spearman suggests that Solowski, or someone else, could have been the perpetrator. Again, "[a]ll conflicts with regard to the evidence must be resolved in favor of the prosecution," *Wilkens*, 267 Mich App at 738, and credibility determinations are within the exclusive province of the jury and will not be second-guessed by this Court. *Gadomski*, 232 Mich App at 28.

Spearman also notes on appeal that she was not under the influence of morphine and there was no morphine or other controlled substances in the vehicle when she was stopped by the police after she fled. Spearman was not actually tested for morphine, but she did pass field sobriety tests. In any event, as the prosecutor argued in his closing argument, motive is not an essential element of the crimes at issue. See *People v Herndon*, 246 Mich App 371, 412-413; 633 NW2d 376 (2001) (stating that motive can be helpful to show the necessary elements of a crime, even if motive is not an essential element itself). Even if Spearman did not consume the morphine or bring it with her out of the hospital, the jury could still infer that she was the only person who had the opportunity to adulterate the medicine. Moreover, Spearman's motive may have been thwarted by Solowski's discovery.

In sum, viewing the evidence in a light most favorable to the prosecution, *Harverson*, 291 Mich App at 175, a reasonable jury could conclude that there was sufficient evidence to find Spearman guilty of two counts of adulterating, misbranding, removing, or substituting a drug or device knowing or intending that the drug or device shall be used.

## II. AMENDMENT OF THE INFORMATION

Spearman's second argument on appeal is that the trial court abused its discretion by amending the information at the close of the prosecutor's proofs to include the charge of felonious assault. We disagree.

"This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion to amend an information. The trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Perry*, 317 Mich App 589, 594; 895 NW2d 216 (2016) (citations omitted).

A criminal defendant has a constitutional right to due process, which requires that the defendant be sufficiently apprised of the charges being brought against him. *People v Higuera*, 244 Mich App 429, 442; 625 NW2d 444 (2001). "A trial court may amend an information at any time before, during, or after a trial, as long as the amendment does not unfairly surprise or prejudice the defendant. A defendant may establish unfair surprise by articulating how additional time to prepare would have benefited the defense." *Perry*, 317 Mich App at 594 (citations omitted). Regardless, to prove that reversal is required due to the amendment, a defendant must show "that the alleged error undermined the reliability of the verdict so as to warrant reversal." *People v McGee*, 258 Mich App 683, 693; 672 NW2d 191 (2003).

Although Spearman argues that the prosecutor should have moved to amend the information before trial, she does not assert any unfair surprise or prejudice. In fact, as the trial court found, the prosecutor stated on several occasions before trial that an amendment including felonious assault was likely if the evidence supported the charge at trial. Spearman was aware of the facts supporting the felonious assault charge from the preliminary examination testimony, both parties addressed the possible charge in opening statements at trial, and defense counsel cross-examined the witnesses extensively about the facts supporting this charge. The trial court did not abuse its discretion by allowing the prosecution to amend the information to include the felonious assault charge.

## III. COURT COSTS

Next, Spearman argues that the trial court erred by imposing $600 in court costs. We disagree but conclude that remand is required for further factual development. Because Spearman did not challenge the imposition of costs at sentencing, this issue is unpreserved, and our review is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Before October 17, 2014, MCL 769.1k(1)(b)(*ii*) provided that a sentencing court may impose "[a]ny cost in addition to the minimum state cost set forth in subdivision (a)." In interpreting this statute, the Supreme Court concluded that it "does not provide courts with the independent authority to impose 'any cost.' " *People v Cunningham*, 496 Mich 145, 154; 852 NW2d 118 (2014). Rather, the Court found that trial courts are authorized "to impose only those costs that the Legislature has separately authorized by statute." *Id*.

However, on October 17, 2014, the Legislature enacted 2014 PA 352, which became effective immediately, to amend MCL 769.1k. As this Court recognized in *People v Konopka*,

309 Mich App 345, 354-355; 869 NW2d 651 (2015), the enacting sections of 2014 PA 352 provide:

> Enacting section 1.  This amendatory act applies to all fines, costs, and assessments ordered or assessed under section 1k of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.1k, before June 18, 2014, and after the effective date of this amendatory act.

> Enacting section 2.  This amendatory act is a curative measure that addresses the authority of courts to impose costs under section 1k of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.1k, before the issuance of the supreme court opinion in [*Cunningham*].

As amended,[1] MCL 769.1k(1)(b) expressly addresses the issue of costs that may be imposed, providing all of the following:

> (*i*) Any fine authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

> (*ii*) Any cost authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

> (*iii*) Until October 17, 2020, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:

> (A) Salaries and benefits for relevant court personnel.

> (B) Goods and services necessary for the operation of the court.

> (C) Necessary expenses for the operation and maintenance of court buildings and facilities.

> (*iv*) The expenses of providing legal assistance to the defendant.

> (*v*) Any assessment authorized by law.

> (*vi*) Reimbursement under section 1f of this chapter.

---

[1] MCL 769.1k was amended again by 2017 PA 64, effective June 30, 2017 (before defendant's September 2017 sentencing), which extended the applicability of MCL 769.1k(1)(b)(*iii*) from October 17, 2017, to October 17, 2020.

In *Konopka,* 309 Mich App at 376, this Court held that the amended version of MCL 769.1k(1)(b)(*iii*) allows the trial court to impose court costs reasonably related to the actual costs incurred by the trial court. This Court determined that the amended version of the statute "applies to all fines, costs, and assessments ordered under MCL 769.1k before June 18, 2014, the date *Cunningham* was decided, and after October 17, 2014, the effective date of the amendatory act." *Konopka*, 309 Mich App at 357. This Court ultimately concluded that the trial court did not commit plain error requiring reversal by imposing the $500 costs, but failed to establish a factual basis, under the amended version of the statute, for that amount. *Id*. at 359 n 6. Therefore, this Court remanded "to the trial court for it to establish a factual basis for the $500 in costs imposed under MCL 769.1k(1)(b)(*iii*), or to alter that figure, if appropriate." *Konopka*, 309 Mich App at 360.

In light of MCL 769.1k(1)(b)(*iii*) and *Konopka*, the trial court here did not commit plain error requiring reversal when it imposed court costs in Spearman's case. But because the costs must be "reasonably related to the actual costs incurred by the trial court," MCL 769.1k(1)(b)(*iii*), and the trial court did not establish a factual basis for its imposition of $600 in court costs, remand is necessary to establish that factual basis or alter the amount imposed.

## IV. ATTORNEY FEES

Finally, Spearman argues that the trial court erred in enforcing its order to repay her court-appointed attorney fees without first assessing her ability to pay. We disagree. Again, Spearman's unpreserved claim of error is reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

MCL 769.1k(b)(*iv*) permitted the trial court to order Spearman to repay the "expenses of providing legal assistance to the defendant." In *People v Jackson*, 483 Mich 271, 292; 769 NW2d 630 (2009), the Michigan Supreme Court held that, once a trial court attempts to enforce an imposition of court-appointed attorney fees, "the defendant must be advised of this enforcement action and be given an opportunity to contest the enforcement on the basis of his indigency." If the defendant makes a timely challenge in the trial court, then the trial court is required to evaluate if the defendant "is indigent and unable to pay *at that time* or whether forced payment would work a manifest hardship on the defendant *at that time*." *Id*. at 292-293.

The trial court entered two orders requiring Spearman to pay $4,385 for the costs of her appointed counsel: (1) the September 7, 2017 judgment of sentence, and (2) the September 8, 2017 order of probation. Although Spearman claims on appeal that enforcement of these orders has begun and she references, without citation, a remittance order, there is no record in the lower court file of such enforcement or a remittance order, and also no record that she has challenged any enforcement in the trial court on the basis of her indigence. Moreover, she did not object to the amounts imposed at the time of sentencing. Following *Jackson*, a defendant must make a timely challenge in the trial court before the court will consider her ability to pay. *Id*. Because there is no record that Spearman has challenged the enforcement of the imposed fees or evidence of her indigence, the trial court was not required to review her ability to pay. Therefore, Spearman has not established plain error with respect to the attorney fees.

We affirm Spearman's convictions but remand for the trial court to determine whether there is a factual basis for the imposition of $600 in court costs and to alter that figure if appropriate. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Thomas C. Cameron