*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOHNNY JACKSON,

        Defendant-Appellant.

UNPUBLISHED
June 15, 2023

No. 359438
Macomb Circuit Court
LC No. 2020-002303-FC

Before: SWARTZLE, P.J., and CAVANAGH and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his bench trial convictions for carjacking, MCL 750.529a, armed robbery, MCL 750.529, unlawful imprisonment, MCL 750.349b, felon in possession of a firearm (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to 30 to 60 years' imprisonment for the carjacking and armed robbery convictions. Defendant was further sentenced to 62 to 180 months' imprisonment for the unlawful imprisonment conviction, two to five years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for the felony-firearm conviction. We affirm.

This case arises out of the carjacking, unlawful imprisonment, and armed robbery of the female victim by defendant on October 11, 2020, following their initial meeting at a gas station in Eastpointe, Michigan. The victim entered the gas station, completed her purchase of a pack of cigarettes, walked back out to her car, and just as she "unlocked [her] door and got ready to open it, [defendant] came up to [the victim] with the gun to [her] head and told [her], b***h, you know what it is, get in the car." The victim immediately panicked, and followed defendant's commands to enter the car and "scoot over" to the passenger seat, while defendant continued to point the gun at the victim. The victim never met or interacted with defendant prior to the instant incident. Defendant proclaimed that the victim's "baby daddy" robbed him, and the victim was going to "help him get back at [her] baby daddy . . ." despite the victim's repeated assertions that he had the wrong person.

Defendant proceeded to drive the victim's car to her apartment, after forcing her to divulge her home address, parked the car, and informed the victim that "if [she] tried anything or made any sudden moves he would kill [her]." After defendant and the victim entered the apartment, defendant searched through the victim's purse, and removed $100 and the victim's driver's license. He also acquired the victim's cellphone. At approximately 5:00 a.m. on October 12, 2020, defendant asked the victim to "take him to [her] baby daddy," and defendant proceeded to drive himself and the victim to Flat Rock, Michigan, where the father of the victim's child resided. The drive took approximately 45 minutes, and defendant kept the gun on his person the entire time. Defendant thereafter ordered the victim to drive them "back to the city," and dictated the victim stop by a different gas station to allow defendant to purchase marijuana. After returning to the victim's apartment to smoke marijuana, defendant and the victim subsequently visited the residence of defendant's sister, and a local restaurant. While seated alone in the restaurant parking lot, the victim was able to contact a friend for help.

Following the trip to the restaurant, defendant and the victim returned to the victim's apartment, where the victim was able to speak to police officers on her cellphone under the guise she was contacting a local college concerning registration for upcoming classes. Defendant then asked the victim to "go out to the car to get the cigarettes and, when he did that, [the victim] jumped up and grabbed [her] keys and [her] phone and opened up the door, and the police was there, and [she] ran out with [her] hands up." The victim then told the "police officer everything that happened to [her]," and defendant was subsequently arrested.

Defendant argues that his carjacking conviction should be vacated because there was insufficient evidence to demonstrate that defendant intended to permanently deprive the victim of her car, as required when "in the course of committing larceny of a motor vehicle" per MCL 750.529a. Defendant further advances that he was denied the effective assistance of counsel at the pretrial stage when defense counsel overestimated his chances at trial and failed to provide defendant with relevant discovery, which included the gas station surveillance video stipulated to and admitted at trial, and consequently induced defendant to forgo any potential plea bargain.[1] We disagree.

## I. CARJACKING CONVICTION

We review de novo a challenge to the sufficiency of the evidence. *People v Byczek*, 337 Mich App 173, 182; 976 NW2d 7 (2021). In evaluating a defendant's claim concerning the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecution to discern whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Head*, 323 Mich App 526, 532; 917 NW2d 752 (2018). "With

---

[1] Per the trial testimony of the victim and Detective Andrew Wood, a detective with the Eastpointe Police Department, the aforementioned gas station surveillance footage depicted the initial interaction between defendant and the victim, which included defendant running up to the victim, placing the gun to her head, and forcing her in her car.

regard to an actor's intent, because of the difficulties inherent in proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v McKewen*, 326 Mich App 342, 347 n 1; 926 NW2d 888 (2018).

"[D]ue process requires the prosecution to prove every element beyond a reasonable doubt." *People v Oros*, 502 Mich 229, 239 n 3; 917 NW2d 559 (2018). MCL 750.529a provides, in pertinent part:

> (1) A person who in the course of committing a larceny of a motor vehicle uses force or violence or the threat of force or violence, or who puts in fear any operator, passenger, or person in lawful possession of the motor vehicle, or any person lawfully attempting to recover the motor vehicle, is guilty of carjacking, a felony punishable by imprisonment for life or for any term of years.

> (2) As used in this section, "in the course of committing a larceny of a motor vehicle" includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the motor vehicle.

Carjacking is a specific intent crime, requiring the prosecution to establish beyond a reasonable doubt that "the defendant's acts occurred during an attempt to commit, during the commission of, or after the commission of a larceny of a motor vehicle, [and] . . . that the defendant had the intent to steal or permanently deprive a person of the motor vehicle." *People v Smith*, 336 Mich App 297, 307; 970 NW2d 450 (2021).

Our Supreme Court has held that "the plain meaning of the phrase 'in an attempt to commit the larceny' applied to 'situations in which a criminal defendant makes "an effort" or undertakes an "overt act" with an intent to deprive another person of his property, but does not achieve the deprivation of property.' " *Id*., quoting *People v Williams*, 491 Mich 164, 174; 814 NW2d 270 (2012). The specific intent to permanently deprive the owner of his or her property "does not require, in a literal sense, that a thief have an intent to *permanently* deprive the owner of the property." *People v Harverson*, 291 Mich App 171, 178; 804 NW2d 757 (2010) (quotation marks and citation omitted). Rather, "the intent to permanently deprive includes the retention of property without the purpose to return it within a reasonable time or the retention of property with the intent to return the property on the condition that the owner pay some compensation for its return." *Id*.

Defendant argues that the prosecution failed to establish that defendant intended to retain the car without the purpose of returning it within a reasonable time or to return it on the condition that the victim pay some compensation for its return. Defendant further advances that the victim was with defendant the entire time defendant was in her vehicle, the victim consistently maintained access to her car keys, and the victim was free to leave defendant's presence on several occasions while the car remained parked in her apartment lot. However, considering the evidence in a light most favorable to the prosecution, a rational trier of fact could have found all the elements of carjacking, including the requisite intent, had been proven beyond a reasonable doubt.

The gas station surveillance video and the victim's testimony established that defendant initially approached the victim at the gas station just as the victim "unlocked [her] door and got

ready to open it, [defendant] came up to [the victim] with the gun to [her] head and told [her], b***h, you know what it is, get in the car." The victim immediately panicked, and followed defendant's commands to enter the car and "scoot over" to the passenger seat, while defendant continued to point the gun at the victim. Defendant further proceeded to ask one of his friends, who was present at the gas station, to "get in the car," but the friend refused. Defendant continuously used the victim's car, whether he was driving the vehicle himself or forcing the victim to drive the car on his behalf, to visit his sister's residence, a local restaurant, the home of the victim's "baby daddy," and the victim's apartment. Defendant also obtained the victim's driver's license and cellphone, and repeatedly threatened the victim by asserting "he's got to get [her] baby daddy because [her] baby daddy supposedly took some money from him, and [she] had to help him, and if [she] didn't help him he was going to kill [her]." Moreover, Detective Wood testified that defendant admitted, during their interview, that he had taken a photograph of the victim's license for himself.

> As the trial court opined, defendant
>
>  . . . maintained control of the vehicle, maintained control of []the victim's freedom, maintained control of the keys under the threat, as testified, to her, under the threat of being shot or killed, and after being assaulted, as well, maintained control of that vehicle by main—certainly, during the carjacking incident itself, as well as subsequently, when he either forced her to drive or drove the vehicle himself and maintained possession of the, of the keys which would have controlled the vehicle.

Regardless of whether defendant predicated the return of the victim's car on the repayment of the debt of her child's father, or defendant intended to retain the vehicle without the purpose of returning it within a reasonable time, it is clear that defendant intended to permanently deprive the victim of her vehicle under either definition. See *Smith*, 336 Mich App at 308 (stating the defendant demonstrated the requisite intent under the carjacking statute when the defendant hit the officer, attempted to take his gun, and "climbed into the front driver's side of the patrol vehicle"); see also *Harverson*, 291 Mich App at 178-179 (determining that the defendant possessed the permanent intent to deprive the victim of his property when he snatched the victim's glasses and told him, "you get these back when we get the phone back").

The sole reason defendant was unable to maintain possession over the victim's car is because he was subsequently arrested at the victim's apartment building after the local police department successfully contacted the victim. Whether the underlying offense was a completed larceny, or an attempted larceny, is irrelevant for purposes of the carjacking statute, and defendant's conduct demonstrated that he intended to permanently deprive the victim of her vehicle, and potentially her life, and kept her hostage doing so. Moreover, the victim testified that defendant withheld her driver's license, apartment keys, and car keys throughout the two-day incident, and the victim did not attempt to escape because defendant continuously threatened her and asserted that "he could kill [the victim] and leave [her] in [the] apartment, and turn the air conditioner on, and no one would know [she] was dead in [her] apartment." In light of the record, a rational trier of fact could have reasonably inferred and found that defendant had the intent to steal or permanently deprive the victim of her vehicle. Therefore, the evidence is sufficient to support the guilty verdict on the charge of carjacking.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his defense attorney provided ineffective assistance of counsel at the plea-taking stage of this case when counsel overestimated defendant's chances at trial and failed to provide defendant with relevant discovery, which consequently prevented defendant from pursuing a plea deal. We disagree.

A defendant "must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). A defendant may also preserve the issue by "filing in this Court a motion for remand to the trial court for a [*People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973),] hearing." *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). While defendant moved for a new trial in the lower court based on the same arguments he now makes on appeal, there was no evidentiary hearing to develop defendant's claim of ineffective assistance of counsel; therefore, this Court's review is limited to errors apparent on the record. See *Head*, 323 Mich App at 538-539. "Generally, an ineffective-assistance-of-counsel claim presents a 'mixed question of fact and constitutional law.' " *People v Hieu Van Hoang*, 328 Mich App 45, 63; 935 NW2d 396 (2019), quoting *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). "Constitutional questions are reviewed de novo, while findings of fact are reviewed for clear error." *Hieu Van Hoang*, 328 Mich App at 63.

"Defendants are entitled to the effective assistance of counsel when considering or negotiating a plea agreement." *People v White*, 331 Mich App 144, 148; 951 NW2d 106 (2020). The obligation of defense counsel, at the pretrial stage, is to properly advise the defendant regarding " 'the nature of the charges or the consequences of the guilty plea[,]' and the 'possible defenses to the charges to which the defendant is pleading guilty,' so defendant has 'the ability to make an intelligent and informed choice from among his alternative courses of action.' " *Id.*, quoting *People v Corteway*, 212 Mich App 442, 445; 538 NW2d 60 (1995). "The proper remedy for ineffective assistance of counsel during plea negotiations will depend on the circumstances of the case, but it could potentially entail resentencing or requiring a rejected plea to be reoffered." *White*, 331 Mich App at 148.

As with any other claim of ineffective assistance, "[t]he defendant has the burden of establishing the factual predicate of his ineffective assistance claim." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). "In the context of pleas, a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v Cooper*, 566 US 156, 163; 132 S Ct 1376; 182 L Ed 2d 398 (2012). Consequently,

> [a] defendant seeking relief for ineffective assistance in this context must meet [*Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984)]'s familiar two-pronged standard by showing (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [*Douglas*, 496 Mich at 592, quoting *Lafler*, 566 US at 163.]

*Lafler* did not institute a new rule of law, rather, it only established how the familiar *Strickland* test applied to plea negotiations. When a defendant claims to be prejudiced by rejecting a plea offer on the basis of ineffective assistance of counsel, the defendant must show (1) "that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)[,]" (2) "that the court would have accepted its terms[,]" and (3) "that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 566 US at 163-164.

In this case, defendant's claim of ineffective assistance of counsel necessarily fails because the prosecution never extended a plea offer, never intended to extend a plea offer, and vocalized its discontent with the limited charges against defendant during the hearing addressing defendant's motion for a new trial. While defendant produced a self-serving affidavit to demonstrate that there were plea negotiations underway before trial, there is nothing in the evidentiary record to demonstrate that was the case. We recognize that defense counsel is obligated to "properly advise defendant . . . so defendant has the ability to make an intelligent and informed choice from among his alternative courses of action." *White*, 331 Mich App at 148 (quotation marks and citation omitted). Defense counsel did not appear to have much leeway concerning strategy in the plea context, which is demonstrated by the fact that between January 2021 and September 2021, the trial court held several pretrial hearings, and there was never any discussion regarding a potential plea. Rather, as the prosecution notes, defendant's only two options were to go to trial or plea as charged, neither of which would have impacted the outcome of the proceedings.

While defendant advances that he would have pursued plea negotiations with a different state of mind if he was aware of the substantial evidence against him, which included the gas station surveillance video and other discovery, the prosecution explicitly stated during the motion hearing that defense counsel "continued throughout all of the pendency of this case to get a deviation [from the charges] approved for his client[,]" by filing a written request for a lenient plea deal, but the prosecution repeatedly denied the requests. The prosecution further asserted that "[t]here was never going to be any reduction in charge[,]" "it would have been pointless to continue down that road[,]" and the prosecution was "upset really that other[] charges weren't levied against [defendant] . . . ." Consequently, whether defense counsel provided alternative advice or shared discovery with defendant is inconsequential when the prosecution clearly did not offer a plea nor ever intended to do so. Moreover, as the trial court noted during the motion hearing, defendant was asked whether he was forced into waiving his right to a jury trial or given any promises concerning the outcome, and defendant responded in the negative.

Ultimately, defendant cannot establish that trial counsel's performance prejudiced him, and thus, defendant is not entitled to relief.

Affirmed.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ Anica Letica